UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TOMANGO SIMS,** | **Civil Action No. 12-7321** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **CHARLES WARREN, et al.,** | |
| **Respondents.** | |

**WOLFSON, United States District Judge:**

I.      **INTRODUCTION**

Petitioner Tomango Sims ("Petitioner" or "defendant") filed a Petition for a Writ of

Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction filed in the

Superior Court of New Jersey, Law Division,  Monmouth County, on March 10, 2006.  The State

has filed an Answer with the state court record, and Sims has filed a Reply.  After carefully

reviewing the arguments of the parties and the state court record, this Court will deny the

Petition with prejudice and deny a certificate of appealability.

II.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

In a five-count indictment, Petitioner Tomango Sims was charged with felony murder, in

violation of N.J.S.A. 2C:11–3(a)(3) (count one); aggravated manslaughter, in violation of

---

[1] The factual recitation is taken from the Appellate Division decisions denying Petitioner's direct
appeal and affirming the denial of his petition for post-conviction relief ("PCR").  Facts related
to each ground for relief are described in more detail in the relevant sections of this Opinion.

N.J.S.A. 2C:11–4 (count two); aggravated arson, in violation of N.J.S.A. 2C:17–1(a) (count three); arson, in violation of N.J.S.A. 2C:17–1(b) (count four); and aggravated assault, in violation of N.J.S.A. 2C:12–1(b)(8) (count five).   The charges stemmed from the destruction, by fire, of the Walter J. Conley Elks Lodge, located in Freehold Borough, during the early morning hours of July 20, 2003.   The body of the lodge's caretaker, Elijah Jenkins, Jr., who was the grandfather of two of defendant's children, was found in the kitchen area of the second floor.

The day after the fire, Patrolman Otlowski was contacted by an individual who claimed to have knowledge regarding the Elks Lodge fire.   That person, who wished to remain anonymous, stated that Petitioner had started the fire.   When the Police spoke with Sims, he waived his *Miranda* rights, and he admitted to setting the fire.   He said he was sorry and that he did not know anyone was in the building.   Sims told the police he just wanted to set a small fire because he "had some issues with the Elks Lodge."   Prior to trial, Petitioner filed a motion to suppress his statement to police.   The trial court held a *Miranda* hearing centered on the voluntariness of Sims' statement to police and denied the motion and hearing testimony from three officers involved in Sims' questioning.

Petitioner proceeded to trial represented by counsel, after his counsel had unsuccessfully moved to withdraw.   Sims testified at trial.   He was acquitted of aggravated manslaughter and aggravated arson, but he was found guilty of the lesser-included offenses of reckless manslaughter and arson.   The jury also found defendant guilty of the remaining charges, including felony murder for causing the death of Elijah Jenkins, Jr.   After merging the counts in accordance with state law, the trial court sentenced defendant to a thirty-year prison term for felony murder with a thirty-year period of parole ineligibility under N.J.S.A. 2C:11–3(b)(1).

Defendant received a concurrent five-year term on count five for knowingly or purposely starting a fire which resulted in bodily injury to a fireman.

In an unreported opinion, the New Jersey Appellate Division affirmed defendant's conviction and sentence. *State v. Simms*, No. A–5104–05, 2009 WL 587014 (App. Div. Mar. 10, 2009).[2] The New Jersey Supreme Court denied defendant's petition for certification. *State v. Sims*, 199 N.J. 515 (2009). In June 2009, defendant timely filed a *pro se* PCR petition. On April 19, 2010, through assigned counsel, defendant filed an amended PCR petition. Following oral argument on June 11, 2010, the same trial judge who presided over petitioner's trial denied defendant's petition without an evidentiary hearing and memorialized the denial in an order on the same date. (*See* ECF No. 7-14.) On December 15, 2011, the Appellate Division affirmed the denial of Petitioner's PCR in an unpublished opinion. *State v. Simms*, 2011 WL 6219532 (App. Div. Dec. 15, 2011). On July 12, 2012, the New Jersey Supreme Court denied certification. 211 N.J. 607 (2012).

Petitioner's habeas Petition ("Petition") was docketed on November 21, 2015 and raises five grounds for relief that mirror grounds raised in his direct appeal and his PCR. (ECF No. 1.) The Petition is fully briefed and ready for disposition.

## III.   DISCUSSION

### A.  Standard of Review

Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Anti–

---

[2] The 2009 and 2011 Appellate Division decisions list Petitioner's name as "Tomango SIMMS, a/k/a Tomango Sims."

Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus. The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated petitioner's federal claim on the merits,[3] a federal court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)). The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before

---

[3] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the claim, and 2) resolves th [at] claim on the basis of its substance, rather than on a procedural, or other, ground." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

the state court that adjudicated the claim on the merits. *See Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. *See Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004). "[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405–06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*, 529 U.S. at 413. With regard to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005). Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable

5

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

### B.  GROUND ONE:  Due Process – Erroneous Jury Instruction on Causation

Petitioner first asserts that the trial judge erred in instructing the jury on causation because (1) the trial judge gave the complete charge for causation when charging the jury on felony murder but did not give the full charge for causation when charging the jury on aggravated manslaughter, reckless manslaughter, or arson, and because (2) the instruction for felony murder causation instruction was not tailored to the facts.  (ECF No. 1, Pet. at 12.) Petitioner presented this claim on direct appeal, and contended that that the failure to give the causation instructions violated both *State v. Martin*, 119 N.J. 2 (1990) and *State v. Green*, 318 N.J. Super. 361 (App. Div. 1999).   (ECF No. 7-15, Pet. App. Br. at 8-15.)  Petitioner's heading in his appellate brief on direct appeal states that that the jury instructions also violated Defendants right to Due Process under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, but the brief does not identify any precedent or arguments supporting the alleged constitutional violation.  The New Jersey Appellate Division, reviewing the instructions for plain error, noted that Sims conceded that the trial court gave the model charge for felony murder:

> Defendant also argues that his convictions should be reversed because of erroneous jury instructions. Although defendant concedes the trial court "gave the model jury charge for felony murder which included the causation elements," he contends the court erred by failing to tailor the charge to the facts of the case, and by failing to give the causation charge for aggravated manslaughter, and reckless manslaughter.  Because defendant did not object to any portion of the charge at trial, we must determine whether there was plain error requiring reversal. R. 2:10–2.

2009 WL 587014 at *3.  The Appellate Division further rejected Sims' argument that the trial court committed the same error as the trial court in *State v. Martin*, 119 N.J. 2 (1990), where the

6

trial court did not charge the jury on causation, and found that "[t]he [felony murder] charge in this case was a "correct charge" under *Martin*. *Id*. at *4.  Finally, the Appellate Division found that the jury instructions properly charged the jury on reckless homicide:

> Similarly, defendant's argument that the trial court failed to include a causation charge for aggravated manslaughter and reckless manslaughter is without merit. When the trial court charged the jury on aggravated and reckless manslaughter, it instructed the jury that causation was an element and referred the jury back to the definition of causation that it had previously given. In both instances, the court explained the jury was required to find that defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his conduct. When read as a whole, the jury instructions directed the jury to consider everything essential to establish causation for reckless homicide. N.J.S.A. 2C:2–3(c). Under these circumstances, we conclude the jury was correctly charged.

*Id.*

The State contends that Petitioner's arguments on direct appeal regarding the allegedly erroneous jury instructions on causation contain no reference to federal precedent or constitutional analysis and were based entirely on state law.  (ECF No. 7-1, Res. Br. at 1-2.)  As such, the State argues that Petitioner's jury instruction claim fails to state a claim under 28 U.S.C. 2254 (a) and is exhausted and procedurally defaulted.  (*Id.* at 2-5.)  The State acknowledges that Petitioner's Appellate Brief contains references to provisions of the federal Constitution, but argues that the "mere citations to the 5th, 6th, and 14th amendments" in the heading of Petitioner's Appellate Brief is insufficient "to fairly present [P]etitioner's objection to the jury charge as a federal constitutional claim" and describes this claim as a repackaging of a state law claim as a federal error.  (*Id.* at 6.)

The Court agrees with the State that "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  Instead, a habeas petitioner who challenges the sufficiency of state jury instructions

must "point to a federal requirement that jury instructions on the elements of an offense ... must include particular provisions" or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." *Id.*

However, to the extent that Petitioner's constitutional claims were not fairly presented and are thus unexhausted and/or procedurally defaulted, this Court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir.2005) ("Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

Federal court review of state court jury instructions is narrow, and is limited to those instances where the instructions violated a defendant's due process rights. *Echols v. Ricci*, 492 F. App'x 301, 312 (3d Cir. 2012) (citing *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991) (holding that "[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process")). *See also Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (same). The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused). Thus, even if there is "'ambiguity,

8

inconsistency, or deficiency' in the instruction, such an error does not necessarily constitute a due process violation.  Rather, the defendant must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (internal citations omitted).  Finally, in assessing a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

*Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).[4]

Having reviewed the record, the Court finds that Petitioner's claims regarding errors in the causation charges do not fall within the narrow circumstances that warrant habeas relief based on erroneous jury instructions.  Here, the Appellate Division found that the causation instruction for felony murder complied with state law and further noted that the instruction on reckless homicide "read as a whole . . . directed the jury to consider everything essential to establish causation for reckless homicide."  *Id.* at *4 (emphasis added).  This reasoning is consistent with U.S. Supreme Court law.  *See Sandstrom*, 442 U.S. at 523 and *Middleton*, 541

---

[4] Moreover, an error in the jury instructions is not grounds for habeas relief if the error is harmless.  *Pagliaccetti v. Kerestes*, 581 F. App'x 134, 136 (3d Cir. 2014), *cert. denied*, 135 S. Ct. 1552, 191 L. Ed. 2d 644 (2015) (citing *Yohn v. Love*, 76 F.3d 508, 522 (3d Cir.1996)). An error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). In determining whether there is harmless error, we examine the impact of the error on the trial as a whole.  *Id.* (citing *Yohn*, 76 F.3d at 523). Thus, the Court asks whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.  *Id.*  Here, the Court finds no error of constitutional dimension and thus need not address the issue of harmless error.

U.S.at 437, *supra*.  Moreover, this Court has reviewed the relevant record, including the jury instructions given by the trial court, and agrees that the State was not relieved of its burden to prove the essential elements of felony murder, arson, or manslaughter beyond a reasonable doubt.[5]  Petitioner's claim appears to boil down to whether the jury instructions on causation could have been better tailored to the facts of the case, as Petitioner contends is required under State law precedent, but that is not a basis for habeas relief.[6]   As such, Petitioner is not shown that the state court's ruling was an unreasonable application of federal law and he is not entitled to federal habeas relief with respect to this claim.

## C. GROUND TWO: Voluntary Waiver of *Miranda* Rights

Petitioner next argues that State failed to sustain its burden of proof that the Defendant's waiver of rights was voluntary, and that the trial judge's factual and legal findings at the *Miranda* hearing were insufficient to support his decision.  Petitioner raised this argument on direct appeal, and the Appellate Division rejected his *Miranda* claim as follows:

> On appeal, defendant contends, as he did before the trial court, that his statements to the police should be suppressed. Following a *Miranda* hearing, which took place on January 27, 2005, the trial court explained its reasons for denying defendant's suppression motion in a comprehensive twenty-two-page oral decision. The trial court determined that defendant's custodial statements were admissible because the State proved beyond a reasonable doubt

---

[5] The Court discusses the felony murder and arson charges in more detail in section III.E.2, *infra*.

[6] Petitioner also argued in his *pro se* supplemental appellate brief that the jury instructions on causation were deficient, but it is not clear from his Petition whether he raises his *pro se* arguments as a basis for habeas relief.  In his *pro se* supplemental appellate brief, Petitioner appears to reference testimony from his criminal trial and a subsequent civil case brought by Mr. Jenkins' decedents.  (*See* ECF. No. 7-16, *Pro Se* Brief at 3-7.)  Petitioner contends that the testimony suggests that Mr. Jenkins' tried to escape the fire, and that his death was caused, at least in part, by the fact that the Elk's Lodge did not have working smoke detectors but nevertheless permitted Mr. Jenkins to sleep at the Lodge and use a gas stove. (*Id.*)  In light of this evidence, the Petitioner argues that the trial judge should have better tailored the causation charge to the facts of his case.  (*Id.*) This argument is also based on state law and does not constitute the type of erroneous jury instructions that would warrant habeas relief.

> that defendant had voluntarily, knowingly, and intelligently waived
> his constitutional right to remain silent. Because the court's
> findings and conclusions are fully supported by the record and the
> court correctly applied well-settled legal principles, we affirm the
> order denying defendant's motion to suppress his statements
> substantially for the reasons stated by [the trial judge] in his oral
> decision on January 27, 200[5].

2009 WL 587014 at *3.

Because the New Jersey Appellate Division relied on the trial court's oral decision, this Court considers whether the trial court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States', or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)). The *Miranda* hearing centered on circumstances surrounding Sims' statement to police and whether that statement was voluntary. The trial court heard testimony from Sgt. Adam Hubeny, Ptl. Christopher Otlowski, and Det. Michael George, who were present at Petitioner's residence and at the station during Petitioner statement. (*See* ECF No. 7-3, *Miranda* hearing transcript ("*Miranda* Tr.") dated January 27, 2005.) Petitioner's attorney cross-examined each witness, but did not call Petitioner or any other witnesses to testify at the hearing. (*Id.*) The trial court first cited the appropriate legal standards and then made detailed factual findings regarding the events leading up to Petitioner's confession and the circumstances surrounding the confession itself, finding the officers credible and their stories consistent, with "no big gaps in anybody's testimony." (*Miranda* Tr. at 141:1-147:22.) The trial court made the following factual findings regarding the Officer's initial encounter with Mr. Sims at the residence where he was staying:

> I find that after Det. George determined that the person in that
> apartment was Tomango Sims, I find that [Ptl.] Otlowski yelled to
> him, police are here. Come on out. And find that Mr. Sims did

11

come up the three or four steps from the ground apartment in the back. He came up with his hands up.  He went down to, [Ptl.] Otlowski says to the ground.  [Det.] George says to his knees.  It really doesn't matter.

Somebody patted him down.  Did a weapons search.  There were no weapons.  They put handcuffs on him and advised why they were there.  They told him that they were there because they were investigating a fire at the Elks Club. And there was information that he was involved.  They asked him if he would accompany them to the Monmouth County Prosecutor's office on Jerseyville Avenue here in Freehold and he agreed.  I find that he was polite.  He was cooperative. I find at that point that nobody threatened him, nobody beat him, nobody coerced him.  Sure, there were lots of officers there and sure there were officers with weapons. But I find that nobody threatened him.  Nobody accused Mr. Sims.

I find that he agreed to accompany them.  And he in fact did get into a county detective car. Hubeny was the driver. George and Otlowski were in the back and Mr. Sims was in the middle. He was not handcuffed at the time.

(*Id.* at 152:15-153:16.)  The trial court next found that Petitioner was taken to the station and

given appropriate *Miranda* warnings prior to his statement to police:

I find that he was taken to the Monmouth County Prosecutor detective office on Jerseyville Avenue in Freehold and walked into one of the rooms there.  As soon as he was brought into the room, I find that Sgt. Hubeny read him from S-3, which is the Monmouth County Uniform *Miranda* Warning and Waiver Form.

I find that what happened was that the officer read each of the warnings to Mr. Sims, one at a time.  Then gave Mr. Sims an opportunity to read it.  First asked if he understood it.  Gave him a chance to read it.  If he did understand it, gave him an opportunity to initial each of the warnings.  There are five warnings.

I find that the officer did that same procedure after each of the warnings. And I find that Mr. Sims then initialed each of those warnings.  That is borne out by what has been marked into evidence for this hearing as S-3.  At the conclusion of the warnings, I find that Det. Hubeny asked him if he read and understood everything.  He answered yes. When he signed it, he agreed to sign and he did sign.  After that there's another paragraph. And it says that knowing what your rights are, and I'm paraphrasing because I don't have it in front of me, but knowing

12

what your rights are will you waive the right to remain silent and
will you talk to us.  His answer was yes.  He signed that as well.

(*Id.* at 153:17-154:20.)  The court also made the following findings about Petitioner's demeanor

during the questioning:

> All of the officers testified that Mr. Sims was polite. He was
> cooperative. He was a gentleman.  I'm using the terms from the
> officers.  They all were pretty much the same. He was properly
> oriented. That is he understood where he was.  He understood what
> he was doing.  He was not under the influence of any drugs. He
> was not under the influence of any narcotic.  He had no problem
> understanding whatever he did was responsive to what the officer
> asked.  And I've had an opportunity to see Mr. Sims on that day by
> looking at the videotape. He was polite. He was cooperative.  He
> was responsive.  He was normal.  I do find that he became at
> different times highly emotional.

(*Id.* at 155:2-15.)  The court then made the following factual findings regarding Petitioner's

confession:

> [Det.] Hubeny told Sims that they knew that Mr. Sims had
> called some people and had told them that he was responsible.
> And that he was very apologetic about what he had done.  That he
> didn't know that anyone was in the Elks Club.
>
> Officer Hubeny and the other officers, [Ptl.] Otlowski and
> [Det.] George told Mr. Sims that they were aware of the
> relationship between himself and Mr. Jenkins.  That Mr. Jenkins'
> daughter was the mother of Mr. Sims' two children, thus making
> the late Mr. Jenkins a grandfather of those two children.
>
> Once again he began to cry.  He lowered his chin.  He said
> that he wasn't aware that anyone was in the building. He refused to
> look up at the officers at the time.  He was crying – at one point he
> was gasping for breath.  And at times he became, crying louder and
> kept repeating over and over that he didn't know anyone was in the
> building.
>
> This went on for some fifteen to twenty minutes.  Gave him
> a chance, the officers said that they gave him a chance to calm
> down a little bit. . . .
>
> And then he told his story.  He said he was upset because
> the Elks Club had refused to honor his mother's application to
> reapply. And also that the Elks Club refused to give a refund to his
> sister who had booked a room, a banquet room.  But the room had

been double booked and they gave the other person the room and wouldn't give her money back.

So he said that he went to his family's house in Freehold.

He went into the garage and he got either gasoline or kerosene, put it in a liquor bottle. And he walked to the Elks Club. He got there about 4:30 or 4:45 a.m.

He said he also brought with him matches and paper towels. He said that he went to the front door. He put the paper towels by the front door. He poured the gasoline or kerosene and lit it and started walking away. He said that he looked back.

It looked like the fire was out. And while he was telling this story, he became emotional again and crying and continued to reiterate that he didn't mean to kill anyone.

He was asked whether or not he would give a written statement and he agreed to do that.
. . . .
Thereafter, Mr. Sims is asked whether or not he would read his statement on video. I find that he did that. And those are the observations that I talked about earlier where I saw that he was polite, calm, quiet. And even on the videotape, while I found that he was crying and highly emotional earlier, I find that he wasn't on that videotape.

He agreed that this was his statement. He made one correction when he was reviewing the statement on the videotape. There was something that was not done right. He made that correction. He signed the statement.

After the statement was finished Hubeny asks Mr. Sims if he would go over to the door and show him, show the Detective what happened. He went to a door in that room and he graphically explained what he did.

The door was a little different than the front door of the Elks Club. He says, he showed how he put down the paper and how he poured the flammable fluid.

I find that when he left the scene in the area of Broad Street not far from where what happened, where the fire was, threw the bottle away. I find that thereafter the officers applied for and received a search warrant. They went to the premises of his family home. Went to the garage. There they found a red plastic bottle or container that contained a flammable fluid. They found, in the house they found the empty roll from the paper towels. They found stick matches and they found some liquor bottles. So there was corroboration.

14

(Id. at 156:24-158:18; 159:17-160:21.)  The trial judge then made the following ruling regarding

the voluntariness of Petitioner's statement to police:

> I have to make a determination as to whether or not the
> State has proven beyond a reasonable doubt that this defendant did
> knowingly, voluntarily and willingly waive his right to remain
> silent and provide that statement.
>
> I have absolutely no problem making that determination.
> Mr. Eisler on behalf of his client has said that the defendant was
> coerced into giving this statement based upon his emotional state.
> Emotional state really doesn't enter into it.  I gave a number of
> criteria that can be used when the Court determines whether a
> statement was given voluntarily. First is defendant's age, education
> and intelligence. I heard his age but I don't remember.  It's not
> important.  Nor do I know about his education.  But he appeared to
> be intelligent.  He responded to everything that I saw in the tape.
> And the officers didn't indicate there was anything unusual about
> his intelligence.
>
> The period of detention.  The period of detention was very
> short from the time that he was picked up in Manalapan to the time
> that he ultimately made his statement was only a couple of hours.
> The length of the interrogation. There was hardly any
> interrogation.  In terms of minutes, twenty minutes or so.
> Techniques used in conducting investigation, -- bad cop/good cop,
> threats of brutality, none of that. I find that there were no untoward
> techniques used in conducting the interrogation.  The only thing
> that really was done was that the officers told him what the case
> was against him and he readily confessed.
>
> Any psychological pressures or other coercive means used.
> There were none other than just explaining to him what this case
> was about and he should do the right thing and give a statement.
> Absence of counsel.  There was no counsel.  He waived his right to
> counsel.  Was there a failure to advise defendant of his
> constitutional rights. None at all.  I find that on two occasions that
> the rights were appropriately and properly given to him.  And any
> mental or physical punishment, there was none.  Yes, he was
> crying.
>
> Yes, he was emotional.  Yes, he was in an emotional state.
> Mr. Eisler said that this created a dangerous situation.  It didn't
> create a dangerous situation.  It's just the way it was that Mr. Sims
> realized that not only had he started a fire but whether
> inadvertently or not, he had killed some part of his family.

. . . . Mr. Eisler says that he was in the Prosecutor's office where he didn't feel like he had any control. This was alien to him. I don't know if it was alien to him. He might have been there before, been to police headquarters before. This was not some place where he put in a cell, kept in a cell for a long time. Whether anybody was threatening – never happened.

His world was out of orbit and his life was out of control. I'm not sure of that. He made a big, terrible mistake and he realized he made a mistake. I don't find that that was either psychological or physical coercion used to get him to speak. He was ready to speak. He wanted to tell, he'd been telling people on the telephone what he had done. He may have been telling the people on the telephone what he had done when the officers were outside of his room. They couldn't really hear what he was saying but he was emotional in that conversation as well.

I find the State has proven beyond a reasonable doubt this defendant waived his rights, voluntarily, knowingly and willingly after having been appropriately advised of those rights. And as a result of all the findings that I've made, I will deny the application to suppress the motion.

(*Miranda* Tr. 160:22-163:220.)

In light of the legal standard applied by the trial court and the detailed factual findings supporting the trial court's decision, Respondent contends that Petitioner is not entitled to habeas relief because the State Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented during the *Miranda* hearing. (ECF No. 7-1, Res. Br. at 8.)   The Court agrees.

Under federal law, to introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986); *see also Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) ("Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused "in fact knowingly and voluntarily

16

waived [*Miranda*] rights" when making the statement."). This is a rule of constitutional dimension, violation of which may justify issuance of a writ of habeas corpus. *See generally Dickerson v. United States*, 530 U.S. 428 (2000). "[T]he ultimate issue of 'voluntariness' is a legal question requiring independent federal determination," and is thus not subject to the § 2254(d) presumption of correctness. *Miller v. Fenton*, 474 U.S. 104, 109–110 (1985). However, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant, are entitled to the § 2254(d) presumption." *Id.* (internal citations omitted).

A court will inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012). The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). The Supreme Court has also held that although compliance with *Miranda* does not conclusively establish the voluntariness of a subsequent confession, the "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984).

In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434

(2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). These surrounding

circumstances include "not only the crucial element of police coercion, *Connelly*, 479 U.S. at

167," but may also include "the length of the interrogation, its location, its continuity, the

defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*,

507 U.S. 680, 693 (1993) (some internal citations omitted). "[S]ubsidiary questions, such as the

length and circumstances of the interrogation, the defendant's prior experience with the legal

process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting

testimony of police and defendant.  The law is therefore clear that state-court findings on such

matters are conclusive on the habeas court if fairly supported in the record and if the other

circumstances enumerated in § 2254(d) are inapplicable." *Dickerson*, 474 U.S. at 117.  The

Supreme Court has never held, however, that a "defendant's mental condition, by itself and apart

from its relation to official coercion, should ever dispose of the inquiry into constitutional

'voluntariness.'" *Connelly*, 479 U.S. at 164 (holding that coercive police activity is a necessary

predicate to the finding that a confession is not "voluntary" within the meaning of the Due

Process Clause of the Fourteenth Amendment).  Furthermore, "*Miranda* forbids coercion, not

mere strategic deception by taking advantage of a suspect's misplaced trust . . . . Ploys to mislead

a suspect or lull him into a false sense of security that do not rise to the level of compulsion or

coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297-298

(1990).

 Here, the trial judge found, based on the testimony of the three officers, that Mr. Sims

agreed, without threats or coercion, to accompany the police to discuss the fire, and that the

received appropriate *Miranda* warnings prior to questioning.  The trial judge also complied with

*Withrow*, *supra*, in considering the factors bearing on voluntariness, and made detailed factual

findings to support his ruling that Mr. Sims made a knowing and voluntary waiver of his *Miranda* rights.  The judge also determined that Mr. Sims was not coerced into accompanying police or giving his statement. [7]  The Court further notes that federal law does not support the notion that Sim's emotional state alone, in the absence of police coercion, could justify the suppression of his statement.  Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Connelly*, 479 U.S. at 170 (citing *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).   This Court finds that the adjudication of Ground Two by the New Jersey courts was not contrary to, or an unreasonable application of Supreme Court precedent and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  *See* 28 U.S.C. § 2254(d)(1), (2).  Petitioner is accordingly not entitled to habeas relief on Ground Two.

### D.  GROUND THREE: Failure to Give a Corroboration Charge

Petitioner next contends that the trial judge's failure to provide a proper corroboration charge *sua sponte* violated the Defendant's right to due process and a fair trial.  Petitioner raised this argument on direct appeal, arguing that the State failed to introduce sufficient independent corroborating evidence that would establish the trustworthiness of his confession.  (ECF No. 7-15, App. Br. at 22-26.)  Defendant further contended that "[g]iven the meager corroboration, it was all the more important to guide the jury properly in this case, to alert it specifically to its role

---

[7] Notably, the trial court found that the State proved waiver beyond a reasonable doubt.  That standard is higher than the preponderance of the evidence standard required under federal law. *See Lego v. Twomey*, 404 U.S. 477 (1972); *Connelly*, 479 U.S. at 168 (1986) ("We now reaffirm our holding in *Lego*: Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence.").

in assessing the corroboration." (*Id.* at 25.) The Appellate Division rejected Petitioner's claim

on direct appeal, which was the last reasoned decision on this issue, and made the following

findings:

> In an effort to corroborate defendant's confession, the police
> obtained a warrant to search 94 Center Street. While executing the
> warrant, the police seized a red plastic gas can and various items of
> clothing, which defendant claimed to have worn when he started
> the fire. In addition, the police confirmed there was an outstanding
> application by defendant's mother to reinstate her membership in
> the Elks Lodge, and defendant's sister's boyfriend had deposited
> $100 to rent the Elks Lodge banquet hall, but the hall had not been
> used and the deposit had not been returned.

*Simms*, 2009 WL 587014, at *3. The trial judge, in denying Petitioner's motion to suppress,

likewise found that there was physical evidence of corroboration:

> I find that [after Petitioner made his statement] the officers
> applied for and received a search warrant. They went to the
> premises of his family home. Went to the garage. There they
> found a red plastic bottle or container that contained a flammable
> fluid. They found, in the house they found the empty roll from
> the paper towels. They found stick matches and they found some
> liquor bottles. So there was corroboration.

(ECF No. 7-3, *Miranda* Tr. 160:13-21.)

As with any other part of a prosecutor's case, a confession may be shown to be

"insufficiently corroborated or otherwise deemed unworthy of belief." *Lego v. Twomey*, 404 U.S.

477, 486 (1972); *see also State v. DiFrisco*, 188 N.J. 253, 274 (1990). Although the Supreme

Court has held that "an accused may not be convicted on his own uncorroborated confession,"

*Smith v. United States*, 348 U.S. 147, 152 (1954), the *Smith* case itself contained no discussion of

constitutional requirements. *See U.S. ex rel. Hayward v. Johnson*, 508 F.2d 322, 330, n.28 (3d

Cir. 1975). Petitioner has not pointed to any other Supreme Court precedent establishing law

relating to corroboration charges. Here, as explained by the Appellate Division, Petitioner's

confession was indeed corroborated by independent facts at trial. Further, Petitioner's claim is

20

framed as the failure to give a corroboration charge, but he has not shown that the failure to give such a charge violated the Fourteenth Amendment by relieving the State of its burden to prove the essential elements of the offense beyond a reasonable doubt, as discussed in section III.B., *supra*.  Nor does the failure to give a corroboration charge amount to an unreasonable application of controlling U.S. Supreme Court precedent.  As such, Petitioner is not entitled to relief on this ground.

### E.  GROUND FOUR: Double Jeopardy and Jury Instruction Errors Raised in Pro-Se Brief

Petitioner next contends that his convictions "for both felony murder and reckless manslaughter is a violation of the double jeopardy clause where two separate and distinct convictions for one person cannot stand and based on the erroneous instructions raised in Point 1 and II in Petitioner's *pro se* supplemental brief the felony murder conviction should be vacated and the lesser offense of reckless manslaughter should stand." (ECF No. 1.)  Petitioner's argument in Point three is two-fold:  (1) that his convictions for both felony murder and manslaughter for the same death violates Double Jeopardy and (2) that the manslaughter conviction should stand in lieu of the felony murder conviction due to an errors in the jury instructions on causation and felony murder.[8]   The Court addresses these points in order.

#### 1.  Petitioner's Double Jeopardy Argument -- *Pro Se* Supplemental Brief

In Point three of his *pro se* supplemental brief, Petitioner contends his right to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution was violated. The double jeopardy guarantee protects defendants from successive prosecutions or multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969);

---

[8]  The Court considered and rejected Petitioner's arguments regarding the jury instructions on causation in Section III.B, *supra*, and need not consider them again here.

*State v. Nwobo*, 139 N.J. 236, 257 (1995).  Specifically, the double jeopardy clause precludes: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.  *Illinois v. Vitale*, 447 U.S. 410, 415 (1990).  Petitioner's double jeopardy claim sounds in the third prohibition.  Petitioner claims that his convictions for felony murder and manslaughter arising from a single death violates the prohibition against multiple punishments for the same offense. Where two statutory provisions proscribe the "same offense," they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.  *See Whalen v. United States*, 445 U.S. 684, 692 (1980).  This prohibition on cumulative punishments was not violated here, because Petitioner received only one sentence for the three merged counts, as both the manslaughter and arson counts were merged into the felony murder count for which Sims received a single sentence of thirty years.  (ECF No. 7-13, Sentencing Tr. at 19:9-24.)  As such, Petitioner is not entitled to habeas relief on this ground.

**2.  Petitioner's Jury Instruction Arguments -- *Pro-Se* Supplemental Brief**

With respect to Petitioner's jury instruction arguments raised in his *pro se* supplemental appellate brief, the State argues that the alleged error in the felony murder instruction was not presented as a federal claim but rather framed solely as a matter of state law.   Although the Court agrees that Petitioner appears to have framed the alleged errors in the jury instructions as a matter of state law, the Court construes Petitioner to contend that the trial judge gave an erroneous jury instruction that reduced the burden of proof for proving felony murder.[9]   *See In re Winship*, 397 U.S. at 364 ("the Due Process Clause protects the accused against conviction

---

[9] Sims' *pro se* supplemental appellate brief also raised additional issues regarding the causation charge, which this Court addressed in footnote 5, *supra*.

except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); *Sandstrom*, 442 U.S. at 523 (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).[10]

In his *pro se* supplemental appellate brief, Petitioner challenges the following portion of the felony murder charge given by the trial judge:  "Generally, it does not matter that the act which caused death was committed recklessly or unintentionally or accidentally.  The perpetrator is as guilty of felony murder as he would be if he had purposely or knowingly committed the act which caused death."  (*See* ECF No. 7-12, Jury Charge at 68:4-9.)  Petitioner contends that this singular instruction amounted to plain error in Petitioner's case because arson, "the act which caused death" and the predicate crime for felony murder, requires <u>purposeful</u> conduct as an element of the crime.  (ECF No. 7-16, *Pro Se* Brief at 2.)

The Court begins by noting that the challenged instruction is part of New Jersey's model instruction for felony murder.   This single instruction, read in isolation, appears somewhat ambiguous.  As explained by the Supreme Court, however, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."

---

[10]  As mentioned earlier, to the extent that Petitioner's constitutional claims were not fairly presented and are thus unexhausted and/or procedurally defaulted, this Court can deny them on the merits under 28 U.S.C. § 2254(b)(2).  *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) ("Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

*Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted); *see also Waddington*, 555 U.S. at 190–91.  Here, the charge on felony murder, read as a whole, made it clear to the jury that aggravated arson and arson were the only predicate offenses with which Sims was charged that could form the basis for the felony murder conviction.  (ECF No. 7-12, Charge at 67:6-71:8.)  In turn, the subsequent charges on aggravated arson and arson made it abundantly clear to the jury that in order to find Sims guilty of aggravated arson or arson, they must find beyond a reasonable doubt that Sims started the fire on purpose and defined the term "purpose."  (ECF No. 7-12, Charge at 77:24-84:8.)  Thus, in order to find Sims guilty of felony murder (and arson) based on reckless, accidental, or inadvertent conduct in starting the fire, the jury would have had to ignore the lengthy arson instructions.   Under these circumstances, the Court finds that Petitioner has not shown that it is likely that the jury applied the challenged instruction in a manner that violates the Constitution, and the Court denies relief on this ground.[11]

### F.  GROUND 5: Ineffective Assistance of Counsel Claims

Ground five of the Petition mirrors the arguments made by Petitioner in Points IA and IC in his brief on appeal from the order denying post-conviction relief.  In Point 1A, Petitioner

---

[11] The Court further notes that the alleged error in the felony murder instruction was harmless in light of the appropriate arson instruction and the jury's guilty finding on the arson charge.  *See Pagliaccetti v. Kerestes*, 581 F. App'x 134, 136 (3d Cir. 2014) (no habeas relief if error is harmless), *cert. denied*, 135 S. Ct. 1552, 191 L. Ed. 2d 644 (2015). An error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Here, even if the jury thought they could find Sims guilty of felony murder based on his reckless, accidental, or unintentional conduct, the jury was appropriately instructed that they must find that Sims started the fire on purpose to find him guilty of aggravated arson or arson, the predicate crimes for felony murder in this case, and, the jury found Sims guilty of arson.

argued that trial counsel was ineffective for disclosing confidential information, disparaging the defense position and demanding additional money to continue defending Petitioner. (ECF No. 7-23, PCR Br. at 16-22.) In Point IC, Petitioner argued that trial counsel was ineffective for failing to call him as a witness at the *Miranda* hearing. (*Id.* at 26-35.) The Court first provides an overview of the law governing claims of ineffective assistance of counsel and then addresses each claim for relief.

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970) (emphasis added). To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland* 466 U.S. at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. "The Sixth Amendment guarantees reasonable competence, not

25

perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (*per curiam*) (citing *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

The second prong of the Strickland test, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding.  *Lafler v. Cooper*, 132 S.Ct. 1376, 1394 (2012) (quoting *Strickland*, 466 U.S. at 696).  "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'"  *Collins v. Sec. of Pa. Dept. of Corr.*, 742 F.3d 528, 547 (3d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  "Prejudice is viewed in light of the totality of the evidence at trial and the testimony at the collateral review hearing."  *Id.* (citing *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d. Cir. 2006)).

The Supreme Court has emphasized the difficulty of prevailing on an ineffectiveness claim on habeas review:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotations and citations omitted). In analyzing Petitioner's claims under the two-part test announced in *Strickland*, this Court must also apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings.

### 1. Failure to call Petitioner as a Witness at his *Miranda* Hearing

Petitioner contends that his counsel was ineffective for failing to call him as a witness at the *Miranda* hearing.  In support of this argument, Petitioner submitted a sworn certification on PCR that (1) details his version of the events that led up to his statement to police and (2) states that he told his attorney his version of events but his attorney advised him not testify at the suppression hearing.  On PCR, Petitioner contended that his version of the facts demonstrates that his statement was (1) the involuntary product of an illegal arrest, (2) that his attorney was deficient for failing to call him as witness, and (3) that the court would have suppressed the statement if it had heard Petitioner's version of the story.

In his certification, Petitioner contends that he was drinking on the morning of July 21, 2003, and had a "pretty bad drinking problem at the time." (ECF No. 7-23, Sims Cert. at ¶ 3.) His mother informed him over the phone that Elijah Jenkins had died in the fire at the Elks. Petitioner was extremely upset because Mr. Jenkins was like a family member to him.  After receiving news of Mr. Jenkins' death, Petitioner bought more liquor and continued drinking.  (*Id.* at 4-5.)

When the Officers arrived at the residence where he was staying, "Officer Otlowski reached over the banister and pointed his handgun at [Sim's] face-directly at [his] nose" and [Petitioner] "was ordered to get down on the ground."  (*Id.* at ¶ 6.)  Petitioner avers that his fear was heightened by the fact that he "had been shot in the head by an off-duty corrections officer" at a festival in 1993.  According to Petitioner, Officer Michael George told Petitioner that "they

were taking him in for questioning." Petitioner contends that he "felt that [he] had no choice
except to go wherever they wanted to take me for questioning. I almost felt like I was under
arrest even though I didn't know why." (*Id.*) Detective Hubeny said the word was on the street
that [Petitioner] set the fire at the Elks. Petitioner told him that he didn't know what Officer
Hubeny was talking about and Officer Hubeny slammed the car door shut like he was fed up. At
that point, Officers George and Otlowski entered the vehicle, one sitting on each side of me so
Petitioner couldn't get out. Petitioner contends that he was seated between Officers George and
Otlowski in the patrol car and remained handcuffed on the way to the prosecutor's office, and
Officers George and Otlowski told him that he was a "good guy" and "should do the right thing
and tell them what they wanted to know." Petitioner denied any involvement in setting the fire.
(*Id.* at 7.) Once inside the prosecutor's office, Officers George and Otlowski continued their
efforts to get Sims to talk about his involvement in the fire:

> They explained to me that there were three people in the Elks
> Lodge and one person did not get out, and they told me it was
> Elijah Jenkins. I eventually asked if I should have an attorney
> present before answering any questions or signing anything. In
> response to my asking about having an attorney there, Officer
> Otlowski stated that if I wanted to go through the trouble of getting
> an attorney, the prosecutor would play hardball and pull out the
> evidence against me (at that time, Michael George said that there
> was a videotape of me setting the fire), and I would wind up doing
> a bunch of time.

(*Id.* at 8.) Petitioner contends that he was emotionally distraught and his "mind was also clouded
from the effects of alcohol" he had been drinking. He "began to cry uncontrollably" and at that
point "Officer Otlowski promised [Sims that he] would see [his] children again if [he] told them
what they wanted to know." Detective Hubeny brought him a sandwich and water and read Sims
his *Miranda* warnings and Sims signed the *Miranda* forms. (*Id.* at ¶ 10.) In "a completely

emotionally broken state" Petitioner contends that he "gave in and said something like 'I didn't mean to hurt him.'"  (*Id.*)

Petitioner contends that he told his counsel his version of the events leading up to his statement, but that his counsel nevertheless advised him not to testify at the *Miranda* hearing (*See* ECF No. 7-23, at 151, Sims Cert, at ¶ 16).  Petitioner believes that his testimony was crucial at the *Miranda* hearing because

> This would have been the only way for the Court to hear that my statement was not voluntary in any way. Basically, I was dragged out of an apartment with a gun pointed at my face and taken, while handcuffed, to the Prosecutor's Office for questioning at a time when my greatest fears were being shot and never seeing my children again. Even before the police arrived, as I explained, I was drinking and I was already overcome with emotion about the death of Mr. Jenkins in the fire because I knew him so well and really loved him.

(*Id.* at ¶ 16.)   Notably, however, Petitioner took the stand at trial and testified about the circumstances surrounding his statement.  (ECF No. 7-11, Tr. Direct Examination of Tomango Sims, 66:15-80:20.)

Petitioner presented this claim on his appeal of the denial of his PCR, and the Appellate Division affirmed the trial court's denial of PCR after reviewing the *Strickland* standard:

> Measured under these standards, [the trial judge] properly denied post-conviction relief to defendant and did not abuse his discretion in denying the motion without conducting an evidentiary hearing. [The trial judge] not only presided over the PCR proceedings but presided over the pretrial and trial proceedings. In rejecting defendant's claim that trial counsel was ineffective for not calling him to testify during the *Miranda* hearing, the judge reasoned that had defendant testified at the *Miranda* hearing that the officers entered defendant's premises forcefully, his decision to admit defendant's statement would remain unchanged.

*State v. Simms*, No. A-6206-09T3, 2011 WL 6219532, at *2-3 (N.J. Super. Ct. App. Div. Dec. 15, 2011).   The Appellate Division also quoted the trial judge's findings that Sim's testimony at

trial was not believable and that the trial court, who also viewed Sims' videotaped reenactment, would have reached the same conclusion at the *Miranda* hearing even if Sims had testified:

> ["]As we review [trial counsel's] decision not to call [defendant], I do not find that he was ineffective in regard to that. I found—and I recall the testimony pretty well because I went through the transcript. It brought it all back to me. I found the [S]tate's three witnesses to be credible. Their stories were consistent. They were reasonable. They made sense as to what you do when you get some information that a terrible tragedy had happened and that this person may have been responsible. . . I witnessed [defendant's] testimony during the course of the trial. I heard him ... testify. I saw him on the videotape. I saw him recreate what happened at the door of the Elks Club. And the defendant testified in court. He brought out the same facts that are raised in his certification, [the] same things that if he had been called, he would have said at the *Miranda* [h]earing....After viewing the certification of [defendant], I still find that the [S]tate ['s] witnesses were credible, and I find that [defendant] is not credible. I don't believe him. I saw him on the videotape. He's complaining that he was drunk, he was drinking, he went out and bought more booze and drank again. Yes, he was emotional. He was emotional because he had started a fire that killed the grandparents of his children. Yes, he was emotional. When he found out exactly what happened in that fire, he was emotional. So, I understand that. The fact that he was emotional doesn't mean that he was deprived of the ability to make decisions.....The statement that he gave to the police was consistent. It was consistent in regard to the origin of the fire. It was consistent in regard to the analysis that was given by the experts. It was consistent with all the pictures I saw. I made a determination that [defendant] was not a good witness. He was not a believable witness during the course of the trial. He didn't do well on the witness stand. There is no reason for me to believe that he would have done any better if there was no jury present[,] if he had testified early on.["]

*Id.* (citing PCR Transcript).

Here, as the Appellate Division recognized in applying *Strickland*, Petitioner could not show a reasonable probability that the outcome of the suppression hearing would have been different where the PCR judge, who also presided over the suppression hearing and later viewed Petitioner's videotaped statement and heard Petitioner testify at trial regarding largely the same

facts (*see* ECF No. 7-11, Tr. Direct Examination of Tomango Sims, 66:15-80:20), expressly found Petitioner to be a poor witness and not credible.[12]  In short, because the trial judge heard Petitioner's testimony at trial, which largely mirrored his PCR certification, and ruled that he would have denied Petitioner's motion to suppress even if he had heard that testimony at the earlier hearing on the motion to suppress, the Appellate Division correctly determined that Petitioner could not show prejudice under *Strickland*.  This Court thus denies habeas relief on this ground.[13]

### 2.   Counsel's Alleged Disclosure of Privileged Information and other Alleged Ethical Violations

Finally, Petitioner claims that trial counsel provided ineffective assistance of counsel (1) by disclosing privileged information during his motion to withdraw as counsel; (2) by disparaging the defense position, and (3) by demanding additional money to continue representing Petitioner.  Petitioner asserted that counsel's conduct damaged the attorney-client relationship and counsel's defense of Petitioner's case.   (ECF No. 7-23, PCR Br. at 21.)

By way of background, Petitioner's counsel filed a motion to withdraw on September 15, 2005, believing that the Rules of Professional Conduct (RPCs) obligated him to withdraw from

---

[12] The Court has reviewed Petitioner's trial testimony and finds that it is substantially similar to the version of events Sims provided in his certification on PCR.  (*See* ECF No. 7-11, Tr. Direct Examination of Tomango Sims, 66:15-80:20.)

[13] In addition to finding that he would have denied the suppression motion even if Petitioner had testified, the PCR court also determined that Petitioner's counsel advised Petitioner not to testify because he knew that Petitioner would be a poor witness, and thus, the decision not to call Petitioner amounted to trial strategy.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S at 690-91.  This Court need not address the trial court's finding that the decision not to call Sims amounted to trial strategy because the Appellate Division based its ruling solely on prejudice grounds.

the representation.   (ECF No. 7-23, at 161, Certification of Robert W. Eisler ("Eisler Cert") at ¶¶

8-10.)  In support, counsel filed a certification with the trial court explaining that Sims had

originally advised him that he did not set fire to the Elks Lodge and that Sims had maintained

that position up until shortly before the trial was to commence.   Counsel certified and told the

Court at the hearing that defendant stated that "he lied when he told me that he did not set a fire

[at the Elks Lodge] and that he wanted to negotiate a plea."[14] (ECF No. 7-5, Tr. Motion to

Withdraw, 3:3-4:10; ECF No. 7-23, Eisler Cert at ¶ 6.)   After Mr. Eisler notified the prosecutor

and the family of Mr. Jenkins, and worked out the details of the plea, Sims changed his mind and

decided to proceed to trial. (Eisler Cert at ¶ 6; Tr. Motion to Withdraw, 4:9-6:2.)  Because Sims

had to testify at trial in light of his written confession and his video-recorded reenactment of the

crime, counsel believed he was in the position of having to put his client on the stand to give

perjured testimony.  (*Id.* at ¶ 7; 7:11-9:7)  Based on Mr. Sims' admission to him, counsel

believed he no longer had a defense to the arson and felony murder charges.  (*Id.*)  The State did

not oppose the motion, but noted that assigning new counsel would delay in the proceedings.

(Tr. Motion to Withdraw at 13:5-14:11), The trial court denied counsel's motion to withdraw and

set guidelines for Petitioner's testimony, stating that "when it comes to the specifics of how the

fire was set and so forth, that has to be in a narrative." (Tr. Motion to Withdraw at 25:3-6.)  After

the court's ruling, Petitioner briefly stated on the record that he believed Mr. Eisler would be

"ineffective" in continuing to represent him.  (*Id.* at 26: 12-17.)  The trial court responded that

Mr. Eisler had an obligation under the Rules to be effective.  (*Id.* at 26: 18-20.)

---

[14] Mr. Eisler's certification is attached to Petitioner's brief in support of his motion for post-
conviction relief.

On PCR, Sims argued that his trial counsel was constitutionally ineffective because he unnecessarily disclosed privileged information at the hearing on the motion to withdraw and those disclosures irreparably damaged the attorney-client relationship.  In his own certification submitted on PCR, Sims alleged that he did not intend to testify falsely about the fire; his position all along was that he only set fire to a paper towel on the sidewalk outside the Elks Lodge. ECF No. 7-23 at 145-156, Certification of Tomango Sims ("Sims Cert.") at ¶ 24. Relying on the certifications of his sister and uncle (ECF No. 7-23 at 143-44, Certification of Daniel Reynolds; id. at 141-42, Certification of Ta-Tanisha Harrell), Sims also argued that counsel was ineffective for expressing inappropriate and unprofessional concerns about his fee and the strength of the defense's case.  (ECF No. 7-23 at 90-91, Brief in Support of Post-Conviction Relief at 8-9.)

The PCR court first held that defendant's argument regarding the alleged impropriety of counsel's disclosures on the motion to withdraw was procedurally barred because it could have been raised on direct appeal. (ECF No. 7-14, PCR Tr. 47:10-47:25).  The PCR court also went on to determine that the claim had no substantive merit.  Notably, the trial judge did not believe defendant's claim in his certification that he had consistently maintained his innocence to counsel (*id.* at 50:l-50-2):

> I find that there is no reason for Mr. Eisler to have contacted the prosecutor to discuss a plea agreement unless Mr. Sims told him that he was, in fact, guilty. And I find that such an admission of guilty would have been at odds with his previous contention that he was not guilty. Based upon the evidence, I find that a reasonable attorney would believe that Mr. Sims was going to commit perjury while on the stand. Therefore, since the evidence clearly established that Mr. Sims would commit such a criminal, illegal, or a fraudulent act under the rule, Mr. Eisler was required to inform the Court.

(*Id.* at 50:13-50:24.)  The trial court further found that Sims had not shown that counsel's alleged statement to him that he "had no defense," or counsel's alleged request of the family for more money for the defense, gave rise to a viable ineffective assistance of counsel claim. (*Id.* at 50:25 to 52:4).

Petitioner presented this claim on appeal from the Order denying PCR, and the Appellate Division affirmed the PCR court's denial of these claims for the reasons stated by the trial judge, making the following additional comments:

> Likewise, apart from finding that defendant's challenge to his trial counsel's motion to withdraw was procedurally barred pursuant to Rule 3:22-4, [the trial judge] rejected defendant's claim, supported by certifications, that trial counsel's motion was influenced by his request for more money, which had not been paid to him. The judge stated: "[Trial counsel] continued to represent defendant. He didn't ask to be relieved because he wasn't paid. That wasn't his reason. He gave a reason, which was an appropriate reason. He was concerned that somebody was going to lie. I don't find any defect in counsel's representation." Moreover, assuming, as defendant urges, trial counsel violated the Rules of Professional Conduct (RPC) by disclosing information to the court beyond that which was necessary to support his motion to withdraw as counsel, a violation of the RPC does not necessarily equate to ineffective assistance of counsel. *See Nix v. Whiteside*, 475 U.S. 157, 165, 106 S.Ct. 988, 993, 39 L. Ed.2d 123, 134 (1986) (holding that a "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel").  Trial counsel, in support of his motion to withdraw, pointed to specific statements made by defendant that provided a "firm factual basis for [trial counsel's] belief" that defendant intended to commit perjury. *United States ex rel. Wilcox v. Johnson*, 555 F .2d 115, 122 (3d Cir. 1977).  Additionally, during pretrial proceedings, trial counsel presented the court with the events that unfolded subsequent to defendant's admission to him that he had lied when he told counsel that he had not set the Elks Lodge afire. Specifically, trial counsel indicated that based upon this new revelation, defendant expressed a willingness to plead guilty, and he therefore met with the assistant prosecutor assigned to the case in an effort to negotiate a plea agreement. A proposed agreement was reached and memorialized on plea forms, but when presented to defendant, he changed his mind.

34

*State v. Simms*, No. A-6206-09T3, 2011 WL 6219532, at *3-4 (N.J. Super. Ct. App. Div. Dec.

15, 2011).

 The Appellate Division also found no error in the trial court's decision to deny Petitioner

an evidentiary hearing, despite the certifications Petitioner submitted in support of his petition:

> In short, while at first glance the issues defendant raised in his
> PCR petition may have suggested that an evidentiary hearing was
> warranted, having presided over all of the pretrial and trial
> proceedings, [the trial judge] was in the best position to assess
> whether defendant's post-conviction proofs, as set forth in the
> certifications submitted in support of the petition, established a
> prima facie case of ineffective assistance of counsel warranting an
> evidentiary hearing. *Precise*, supra, 129 N.J. 451. A defendant is
> entitled to an evidentiary hearing where the PCR judge concludes
> there are material factual issues in dispute that cannot be resolved
> by reference to the existing record. *See Id.* at 452.  Here, as [the
> trial judge] stated, he had the benefit of his own recollection of the
> observations he made and judgments he reached throughout the
> *Miranda* proceeding and trial that led him to conclude he was able
> to decide defendant's motion without the necessity of conducting
> an evidentiary hearing. Under these circumstances, we find no
> abuse of the court's discretion in declining to conduct an
> evidentiary hearing, and we conclude the finding that defendant
> failed to establish a prima facie case of ineffective assistance of
> counsel is supported by substantial, credible evidence in the
> record.

*Id.* at *4.

 In determining that counsel's disclosure of privileged information during the motion to

withdraw did not amount to ineffective assistance of counsel, the Appellate Division's relied on

*Nix v. Whiteside*, 475 U.S. 157 (1986), in which the Supreme Court addressed how an attorney

should conduct himself or herself upon learning a client will commit perjury upon taking the

stand.  In that case, Emmanuel Whiteside was convicted of the murder of Calvin Love.  At trial,

Whiteside had claimed he stabbed Love in self-defense.  Throughout pretrial preparations,

Whiteside maintained that although he <u>did not</u> see a gun, he believed Love had a gun on his

person.  *Id.* at 160–61.  Just before trial, he told his counsel he intended to change his story and

testify that he saw something "metallic" in his victim's hand, reasoning that "[i]f I don't say I saw a gun, I'm dead." *Id.* at 161–62.  The lawyer attempted to dissuade the defendant from committing perjury and threatened to advise the court if defendant insisted on so testifying.  *Id.* at 161.  On collateral attack of that conviction, Whiteside alleged that his right to counsel and to testify had been violated because, although he took the stand, his attorney had coerced him not to testify that he had seen a gun in Love's hand before stabbing him.  The trial court found that Whiteside would have perjured himself if he testified that he had seen the gun, and held that, because Whiteside's rights to effective assistance of counsel and to testify did not include the right to testify falsely, those rights were not violated. The Eighth Circuit reversed. *Whiteside v. Scurr*, 744 F.2d 1323 (8th Cir. 1984).

The Supreme Court reversed the Eighth Circuit and held that a criminal defendant's right to assistance of counsel does not include the right to cooperation in the commission of perjury in violation of the ethical standards established by states to govern attorney conduct.  *Id.* at 175–76.  Because an attorney does not function merely as an advocate but also as an officer of the court, the "attorney's ethical duty to advance the interests of his [or her] client is limited by an equally solemn duty to comply with the law and standards of professional conduct...."  *Id.* at 168. The Court further held that when a defendant "announces" an intention to commit perjury, the defendant's rights to effective assistance of counsel and to testify are not violated if the attorney takes certain clear steps to prevent the presentation of that false testimony.  Those steps include attempting to dissuade the client from testifying falsely, threatening to report the possibility of perjury to the trial court, and possibly testifying against the defendant should he be prosecuted for perjury.  As the Court observed, neither right was violated, because the right to testify, assuming there is one, does not "extend to testifying falsely," *id.* 475 U.S. at 173, and because

"the right to counsel includes no right to have a lawyer who will cooperate with planned perjury." *Id.* at 173.

Before disclosing to the court a belief of impending client perjury, however, the lawyer must also have attempted to dissuade the client from committing the perjury. *See Whiteside*, 475 U.S. at 169 ("It is universally agreed that, at a minimum, the attorney's first duty when confronted with a proposal for perjurious testimony is to attempt to dissuade the client from the unlawful course of conduct."); *see also United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 (3d Cir. 1977) (explaining that counsel must have a "firm factual basis for [trial counsel's] belief" that defendant intended to commit perjury).[15]

The Court has reviewed the relevant record and finds that the Appellate Division correctly determined that Petitioner's contention that counsel rendered ineffective assistance of counsel in disclosing privileged communications during the motion to withdraw is foreclosed by *Nix*, and that he cannot show prejudice under *Strickland*. The Court notes that the Third Circuit's decision in *Wilcox*, which is cited by the concurring Justices in *Nix*, 475 U.S. at 189, is also plainly distinguishable from the present matter as the trial court here found that Petitioner's counsel had a firm factual basis for believing that Sims would offer perjured testimony, which this Court has no basis to disturb, and because Petitioner offered the allegedly perjured testimony at trial, albeit in narrative form. Even if *Wilcox* were on all fours with this case, courts may not

---

[15] In *Wilcox*, the Third Circuit stated as follows: "It is apparent that an attorney may not volunteer a mere unsubstantiated opinion that his client's protestations of innocence are perjured. To do so would undermine a cornerstone of our system of criminal justice." 555 F.2d at 120, 122 n.13 (affirming writ of habeas corpus based upon the proposition that Wilcox had been denied his constitutional right to counsel where (1) his attorney could not articulate basis for her belief that defendant's would commit perjury, (2) the court ruled that Petitioner's attorney could withdraw-if defendant testified, and (3) Petitioner elected <u>not</u> to testify under those circumstances.).

grant habeas relief based on a circuit's application of U.S. Supreme Court precedent. *See, e.g.*, *Renico v. Lett*, 559 U.S. 766, 778-79 (2010) (reversing grant of habeas relief and finding, in part, that the Sixth Circuit erred in relying on its own precedent in applying *Arizona v. Washington*, 98 S.Ct. 824 (1978)). Likewise, the Appellate Division's denial of Petitioner's claims that counsel disparaged his defense and improperly sought more money to continue his defense is not contrary to, or an unreasonable application of Supreme Court precedent and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. As such, habeas relief on this claim is denied.

### G. Certificate of Appealability

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, jurists of reason could not disagree that Petitioner's claims are lacking in merit. Therefore, no certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c)(1)(B). *See* Fed. R. App. P. 22(b)(1); 3d Cir. L.A.R. 22.2.

IV.    **CONCLUSION**

For the reasons expressed in this Opinion, the Court denies the Petition with prejudice and denies a certificate of appealability.  An appropriate Order follows.


/s/ Freda L Wolfson
Freda L. Wolfson, U.S.D.J.

Date: December 22, 2015